**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TRAVIS CARRUTH, individually and on behalf of all others similarly situated, | |
| *Plaintiff*, | Docket No. |
| v. | |
| KNORR-BREMSE AG; KNORR BRAKE COMPANY; NEW YORK AIR BRAKE COMPANY; WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORPORATION; FAIVELEY TRANSPORT NORTH AMERICA INC.; and RAILROAD CONTROLS L.P. | |
| *Defendants*. | |

**COMPLAINT**

Plaintiff Travis Carruth, individually and on behalf of a class of all those similarly situated (the "Class"), complains against Defendants Knorr-Bremse AG, Knorr Brake Company, New York Air Brake Company, Westinghouse Air Brake Technologies Corporation, Faiveley Transport North America Inc., and Railroad Controls L.P., and alleges the following:

## I.      INTRODUCTION

1.      This class action challenges unlawful agreements between two of the world's largest rail equipment suppliers to restrain competition in the labor markets in which they compete for employees. Without the knowledge and consent of their employees, Defendants collectively agreed not to solicit each other's employees, recruit each other's employees, hire

each other's employees without prior approval, or otherwise compete for employees (collectively, "no-poach agreements").

2.      Defendants Knorr-Bremse AG ("Knorr") and Westinghouse Air Brake Technologies Corporation ("Wabtec"), and their respective subsidiaries, are each other's top competitors for rail equipment used in freight and passenger rail applications. They also compete with each other to attract, hire, and retain various employees, including rail equipment industry project managers, engineers, sales executives, business unit heads, and corporate officers. Prior to its acquisition by Wabtec in November 2016, Faiveley Transport S.A. ("Faiveley") also competed with Knorr and Wabtec to attract, hire, and retain employees.

3.      Beginning no later than 2009, senior executives at Knorr and Wabtec, including executives at several of their U.S. subsidiaries, entered into no-poach agreements with each other. Beginning no later than 2011, senior executives at certain U.S. subsidiaries of Knorr and Faiveley entered into no-poach agreements with each other. And beginning no later than January 2014, senior executives at the U.S. passenger rail businesses of Wabtec and Faiveley entered into no-poach agreements with each other.

4.      The no-poach agreements spanned several years and were monitored and enforced by high-level company executives, and had the effect of unlawfully allocating employees between the companies, resulting in harm to U.S. workers.

5.      Knorr and Wabtec entered into these illegal agreements and oversaw the implementation of these agreements at their U.S. subsidiaries.

6.      By implementing these unlawful agreements, Knorr and Wabtec (including Faiveley) substantially reduced competition for employees to the detriment of rail-equipment industry workers in this important U.S. industry. These no-poach agreements denied American

2

rail-equipment industry workers access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment, including higher pay. Moreover, these no-poach agreements disrupted the efficient allocation of labor that comes from Knorr, Wabtec, and Faiveley vigorously competing for rail-equipment industry employees.

7.       In *per se* violation of the antitrust laws, the leaders and most senior executives of Knorr and Wabtec secretly agreed to work together to deprive thousands of their employees—American rail-equipment industry workers—of better compensation and deny them opportunities to advance their careers at other companies. These employees include workers in the rail and freight industries, especially project managers, engineers, sales executives, and corporate officers of these companies.

8.       While investigating the Faiveley-Wabtec merger, which was announced in July 2015, the Antitrust Division of the United States Department of Justice (the "DOJ") uncovered these agreements entered into by Defendants to suppress and restrain competition in the labor markets. On April 3, 2018, the DOJ's findings became public and the DOJ reached a settlement with Defendants, charging them with unlawfully agreeing to restrain competition in the labor markets in which they compete for employees, a *per se* violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

9.       The DOJ confirmed that it will not seek to compensate employees who were injured by Defendants' agreements. Without this class action, Plaintiff and the Class will not receive compensation for their injuries, and Defendants will continue to retain the benefits of their unlawful collusion.

## II.      JURISDICTION AND VENUE

10.      Plaintiff brings this action to recover damages and obtain injunctive relief, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

11.      This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of Clayton Act, 15 U.S.C. §§ 15 and 26 and 28 U.S. §§ 1331 and 1337.

12.      Defendants are subject to the jurisdiction of this court by virtue of their nationwide contacts and other activities, as well as their substantial contacts with the State of Pennsylvania, including contacts in furtherance of the conspiracy alleged herein.

13.      Defendants, directly or through their agents, subsidiaries, affiliates, or parents may be found in and transact business in the forum state.

14.      Defendants, directly or through their agents, engage in interstate commerce in the production, distribution, and sale of rail equipment and services related thereto in the United States.

15.      Venue is proper in this judicial district under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(b)-(c) because a substantial part of the acts or omissions giving rise to the claims set forth herein occurred in this judicial district, a substantial portion of the affected interstate trade and commerce was carried out in this district, and one or more Defendants reside in this district.

## III.      PARTIES

16.      Plaintiff Travis Carruth, is a resident of Arlington, Texas.  Plaintiff worked as a signal line engineer for Wabtec's wholly-owned subsidiary Railroad Controls L.P. from

approximately January 19, 2013 until approximately July 2016.  As a result of the conspiracy as alleged herein, Mr. Carruth earned less than he would have absent the alleged conspiracy.

17.     Defendant Knorr-Bremse AG ("Knorr") is a privately owned German company with its headquarters in Munich, Germany. Knorr is a global leader in the development, manufacture, and sale of rail and commercial vehicle equipment. In 2017, Knorr had annual revenues of approximately $7.7 billion.

18.     Defendant Knorr Brake Company is a Delaware corporation with its headquarters in Westminster, Maryland, and is a wholly owned subsidiary of Defendant Knorr-Bremse AG. It manufactures train control, braking, and door equipment used on passenger rail vehicles.

19.     Defendant New York Air Brake Corporation is a Delaware corporation with its headquarters in Watertown, New York, and is a wholly owned subsidiary of Knorr-Bremse AG. It manufactures railway air brakes and other rail equipment used on freight trains.

20.     Defendant Westinghouse Air Brake Technologies Corporation ("Wabtec") is a Delaware corporation with its headquarters in Wilmerding, Pennsylvania—located in Alleghany County, Pennsylvania. Wabtec is a publicly held company, listed on the New York Stock Exchange. With over 100 subsidiaries globally, Wabtec is the world's largest provider of rail equipment and services with global sales of $3.9 billion in 2017. It is an industry leader in the freight and passenger rail segments of the rail-equipment industry. Wabtec Passenger Transit is a business unit of Wabtec that develops, manufactures, and sells rail equipment and services for passenger rail applications. It is based in Spartanburg, South Carolina.

21.     Defendant Faiveley Transport North America, formerly a subsidiary of Faiveley Transport S.A., is now a wholly owned subsidiary of Wabtec, and is a New York corporation headquartered in Greenville, South Carolina. On November 30, 2016, Wabtec acquired Faiveley,

which had been a French société anonyme based in Gennevilliers, France. Prior to the

acquisition, Faiveley was the world's third-largest rail equipment supplier behind Wabtec and

Knorr. Faiveley had employees in 24 countries, including at six U.S. locations. It developed,

manufactured, and sold passenger and freight rail equipment to customers in Europe, Asia, and

North America, including the United States, with revenues of approximately €1.2 billion in 2016.

In the United States, Faiveley conducted business primarily through Defendant Faiveley

Transport North America. Various Faiveley recruiting activities conducted prior to its acquisition

by Wabtec are at issue in this complaint.

22.     Defendant Railroad Controls, L.P. was acquired by Defendant Wabtec in

February 4, 2015, and now operates as a wholly owned subsidiary of Wabtec. Railroad Controls,

L.P. is based in Benbrook, Texas, and is a leading provider of railway signal construction

services.

## IV. THE MARKET FOR RAIL EQUIPMENT EMPLOYEES

23.     During the Class Period, Defendants and their subsidiaries employed Class

members throughout the United States, including this judicial district.

24.     The anticompetitive conduct engaged in by Defendants and their subsidiaries

substantially affected interstate commerce throughout the United States and caused antitrust

injury throughout the United States.

25.     Defendants Knorr and Wabtec (including, formerly, Faiveley) are the world's

largest rail equipment suppliers and each other's top rival in the development, manufacture, and

sale of equipment used in freight and passenger rail applications.

26.     As of December 31, 2017, Wabtec employed approximately 18,000 full-time employees worldwide, and acquired approximately 5,700 employees in 24 countries from its acquisition of Faiveley.

27.     As of December 31, 2016, Knorr employed approximately 24,500 employees worldwide.

28.     The U.S. railroad equipment manufacturing industry is highly concentrated, with the 50 largest companies, including Defendants Knorr and Wabtec, accounting for more than 95% of industry revenue. Imported railroad equipment represents only about 5% of the U.S. railroad equipment market.

29.     Defendants and their subsidiaries also compete with one another and with firms at other tiers of the rail-equipment industry supply chain to attract, hire, and retain employees by offering attractive salaries, benefits, training, advancement opportunities, and other favorable terms of employment.

30.     There is high demand for and limited supply of employees who have rail-equipment industry experience. As a result, firms in the rail-equipment industry can experience vacancies of critical roles for months while they try to recruit and hire an individual with the requisite skills, training, and experience for a job opening. Employees of other rail-equipment industry participants, including the employees of each Defendant's customers, competitors, and suppliers, are key sources of potential talent to fill these openings.

31.     Firms in the rail-equipment industry employ a variety of recruiting techniques, including using internal and external recruiters to identify, solicit, recruit, and otherwise help hire potential employees. Rail companies also receive direct applications from individuals interested in potential employment opportunities. Directly soliciting employees from another rail-

equipment industry participant is a particularly efficient and effective method of competing for qualified employees.

32.     Soliciting involves communicating directly—whether by phone, e-mail, social and electronic networking, or in person—with another firm's employee who has not otherwise applied for a job opening. Such direct solicitation can be performed by individuals of the company seeking to fill the position or by outside recruiters retained to identify potential employees on the company's behalf.

33.     The rail-equipment industry is an insular one in which employees at different firms form long-term relationships and often look to their professional networks to fill a vacancy. In addition, firms in the rail-equipment industry rely on direct solicitation of employees or other rail companies because those individuals have the specialized skills necessary and may be unresponsive to other methods of recruiting.

34.     Such solicitation, often called "cold calling," is a key competitive tool in a properly functioning labor market. Cold calling includes communicating directly in any manner (including orally, in writing, telephonically, or electronically) with another firm's employee who has not otherwise applied for a job opening. Cold calling is a particularly effective recruiting method because current employees of other companies are often unresponsive to other recruiting strategies.

35.     Compared to unemployed workers or employees actively seeking new employment, employees who are not actively seeking to change employers are more likely to be among the most sought after employees. Because they are not looking for other jobs, they are difficult to reach without active solicitation. A company searching for a new hire can save costs and avoid risks by poaching that employee from a rival company.

36.     Through poaching, a company is able to take advantage of the efforts its rival has expended in soliciting, interviewing, and training employees, while simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend. Thus, if each Defendant was truly acting in its own independent self-interest, it would solicit the others' employees, including through offers of increased employment benefits and pay.

37.     The practice of cold calling has a significant impact on employee compensation in many ways. First, without receiving cold calls from rival companies, current employees lack information regarding potential pay packages and lack leverage over their employers in negotiating pay increases. When a current employee receives a cold call from a rival company with an offer that exceeds her current compensation, the current employee may either accept that offer and move from one employer to another, or use the offer to negotiate increased compensation from her current employer. In either scenario, the recipient of the cold call has an opportunity to use competition among potential employers to increase her compensation and mobility.

38.     Second, once an employee receives information regarding potential compensation from rival employers through a cold call, that employee is likely to inform other employees of her current employer. These other employees often use the information themselves to negotiate pay increases or move from one employer to another, despite the fact that they themselves did not receive a cold call.

39.     Third, cold calling a rival's employees provides information to the cold caller regarding the compensation practices of its employer's rival. Increased information and transparency regarding compensation levels tends to increase compensation across all current

employees, because there is pressure to match or exceed the highest compensation package offered by rival employers in order to remain competitive.

40.     Fourth, cold calling is a significant factor in losing employees to rivals. When a company expects that its employees will be cold called by rivals with employment offers, the company will preemptively increase the compensation of its employees in order to reduce the risk that its rivals will be able to poach otherwise undercompensated employees.

41.     The compensation effects of cold calling are not limited to the particular individuals who receive cold calls, or the particular individuals who would have received cold calls but for the anticompetitive agreements alleged herein. Instead, the effects of cold calling (and the effects of eliminating cold calling, pursuant to agreement) commonly impact all salaried employees of the participating companies.

42.     In a competitive labor market, rail-equipment industry employers compete with one another to attract employees. This competition benefits employees because it increases the available job opportunities that employees learn about. It also improves an employee's ability to negotiate for a better salary and other terms of employment. Defendants' no-poach agreements, however, restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in the labor market.

43.     For example, while each Defendant sometimes engages in negotiations regarding compensation levels with individual employees, these negotiations occur from a starting point of the pre-existing and pre-determined baseline compensation level. The eventual compensation any particular employee receives is either entirely determined by the baseline level, or is profoundly influenced by it. In either case, suppression of baseline compensation will result in suppression of total compensation.

44.     Thus, in a properly functioning and lawfully competitive labor market, each Defendant would compete for employees by soliciting current employees of one or more of the other Defendants through cold calling. In a competitive and lawful market, Defendants would use cold calling as one of their most important tools for recruiting and retaining employees. The use of cold calling among Defendants commonly impacts and increases total compensation and mobility of all Defendants' employees.

45.     Defendants' scheme to restrain competition also included notifying each other when an employee of one Defendant applied for a position with another Defendant, and agreeing to limit counteroffers in such situations. In these circumstances, when an employee at one Defendant contacted a second Defendant, the second Defendant would typically (a) notify the first Defendant and (b) not consider the applicant without permission of the other Defendant. Again, if Defendants were acting in their independent self-interest, they would not preemptively tell their competitors that they were offering jobs to the competitor's employees or refuse to bid against their competitors.

## V.     THE CONSPIRACY

46.     Defendants conspired to suppress the compensation paid to their workers and other Class members. To accomplish their conspiratorial goals, Defendants entered into a scheme not to solicit each other's employees. Upon information and belief, Defendants also engaged in collusive discussions in which they exchanged competitively sensitive compensation information in order to limit the compensation offered to current and prospective workers.

### A. Defendants Agreed Not to Solicit Each Other's Employees.

47.     As part of the conspiracy alleged herein, Defendants agreed to severely limit their competition for class members' services by abandoning one of the most effective ways of

11

recruiting employees. Specifically, each Defendant agreed not to solicit employees of other Defendants (including employees of Defendants' subsidiaries). Defendants agreed not to contact their coconspirators' employees to inform them of available positions unless that individual employee had applied for a job opening on his or her own initiative.

**B. Defendants' Unlawful Agreements.**

48.     Over a period spanning several years, Defendants Wabtec, Knorr, and Faiveley entered into similar no-poach agreements with each other to eliminate competition between them (including between their subsidiaries) for employees. These agreements were executed and enforced by senior company executives and implemented throughout their U.S. subsidiaries. The no-poach agreements were not reasonably necessary to any separate, legitimate business transaction or legitimate collaboration between the companies.

**i.   The Wabtec-Knorr Agreement Starts the Conspiracy.**

49.     Wabtec and Knorr entered into pervasive no-poach agreements that spanned multiple business units and jurisdictions. Senior executives at the companies' global headquarters and their respective U.S. passenger and freight rail businesses entered into no-poach agreements that involved promises and commitments not to solicit or hire each other's employees. These no-poach agreements primarily affected recruiting for project management, engineering, sales, and corporate officer roles and restricted each company from soliciting current employees from the other's company. At times, these agreements were operationalized as agreements not to hire current employees from one another without prior approval.

50.     Beginning no later than 2009, Wabtec's and Knorr Brake Company's most senior executives entered into an express no-poach agreement and then actively managed that agreement through direct communications. For example, in a letter dated January 28, 2009, a

12

director of Knorr Brake Company wrote to a senior executive at Wabtec's headquarters, "[Y]ou and I both agreed that our practice of not targeting each other's personnel is a prudent case for both companies. As you so accurately put it, 'we compete in the market.'" This agreement was well-known to senior executives at the parent companies, including top Knorr executives in Germany, who were included in key communications about the no-poach agreement. In furtherance of their agreement, Wabtec and Knorr Brake Company informed their outside recruiters not to solicit employees from the other company.

51.     In some instances, Wabtec and Knorr Brake Company's no-poach agreement foreclosed the consideration of an unsolicited applicant employed by Wabtec or Knorr Brake Company without prior approval of the other firm. For example, in a 2010 internal communication, a senior executive at Knorr Brake Company stated that he would not even consider a Wabtec candidate who applied to Knorr Brake Company without the permission of his counterpart at Wabtec.

52.     Wabtec and Knorr's no-poach agreements also reached the companies' U.S. rail-equipment businesses. In July 2012, for example, a senior executive at New York Air Brake Corporation informed a human resources manager that he could not consider a Wabtec employee for a job opening due to the no-poach agreement between Wabtec and Knorr.

53.     Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with each other to ensure adherence to the agreements. For example, in February 2016, a member of Knorr's executive board complained directly to an executive officer at Wabtec regarding an external recruiter who had solicited a Knorr Brake Company employee for an opening at Wabtec. The Wabtec executive investigated the matter internally and reported back to Knorr that Wabtec's outside

recruiter was responsible for the contact and that he had instructed the recruiter to terminate his activities with the candidate and refrain from soliciting Knorr employees going forward due to the existing no-poach agreement between the companies.

        **ii.**    **Faiveley Enters the Conspiracy with the Knorr-Faiveley Agreement.**

54.    Beginning no later than 2011, senior executives at Knorr Brake Company and Faiveley Transport North America reached an express no-poach agreement that involved promises and commitments to contact one another before pursuing an employee of the other company. In October 2011, a senior executive at Knorr Brake Company explained in an e-mail to a high-level executive at Knorr-Bremse AG that he had a discussion with an executive at Faiveley's U.S. subsidiary that "resulted in an agreement between us that we do not poach each other's employees. We agreed to talk if there was one trying to get a job[.]" Executives at Knorr Brake Company and Faiveley's U.S. subsidiary actively managed the agreement through direct communications with each other.

55.    In or about 2012, a senior executive at Knorr Brake Company discussed the companies' no-poach agreement with an executive at Faiveley Transport North America. This discussion took place at a trade show in Berlin, Germany. Subsequently, the executives enforced the no-poach agreement through direct communications with each other. This no-poach agreement was known to other senior executives at the companies, who directly communicated with each other to ensure adherence to the agreement. For example, in October 2012, executives at Faiveley Transport North America stated in an internal communication that they were required to contact Knorr Brake Company before hiring a U.S. train brake engineer.

56.    After Wabtec announced its proposed acquisition of Faiveley in July 2015, a high-level Knorr executive directed the company's recruiters in the United States and other

jurisdictions to raid Faiveley for high-potential employees, temporarily "cheating" on the no-poach agreement.

### iii.    The Wabtec-Faiveley Agreement.

57.    Beginning no later than January 2014, senior executives at Wabtec Passenger Transit and Faiveley Transport North America entered into a no-poach agreement in which the companies agreed not to hire each other's employees without prior notification to and approval from the other company.

58.    Wabtec Passenger Transit and Faiveley Transport North America executives actively managed and enforced their agreement with each other through direct communications. For example, in January 2014, Wabtec Passenger Transit executives refused to engage in hiring discussions with a U.S.-based project manager at Faiveley Transport North America without first getting permission from Faiveley Transport North America executives. In an internal e-mail to his colleagues, a Wabtec Passenger Transit executive explained that the candidate "is a good guy, but I don't want to violate my own agreement with [Faiveley Transport North America]." Only after receiving permission from Faiveley Transport North America did Wabtec Passenger Transit hire the project manager. One month later, Wabtec Passenger Transit senior executive informed his staff that hiring Faiveley Transport North America's employees was "off the table" due to the agreement with Faiveley Transport North America not to engage in hiring discussions with each other's employees without the other's prior approval.

59.    In July 2015, Wabtec and Faiveley publicly announced their intent to merge. Wabtec closed its acquisition of Faiveley on November 30, 2016. Presently, Faiveley is a wholly-owned subsidiary of Wabtec.

### C. The Investigation by the Antitrust Division of the United States Department of Justice.

60.     On January 19, 2018, the head of the Antitrust Division of the DOJ, Assistant Attorney General ("AAG") Makan Delrahim, announced that the DOJ would bring its first criminal cases involving alleged no-poaching agreements in violation of the Sherman Act in the coming months. The AAG warned that if such activity "has not been stopped and continued from the time when the DOJ's [new antipoaching] policy was made" in October 2016, the DOJ would "treat that [conduct] as criminal."

61.     Following the October 2016 policy announcement, the DOJ and the Federal Trade Commission (the "FTC") jointly issued the Antitrust Guidance for Human Resource Professionals (the "Antitrust HR Guidance"), which acknowledged that the DOJ would "proceed criminally against naked wage-fixing or no-poaching agreements" and that "[n]aked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal under the antitrust laws. That means that if the agreement is separate from or not reasonably necessary to a larger legitimate collaboration between the employers, the agreement is deemed illegal without any inquiry into its competitive effects."

62.     In July 2015, Wabtec announced its intent to acquire Faiveley. Stemming from the DOJ's review of the Wabtec-Faiveley merger, the Antitrust Division of the DOJ began investigating Defendants Knorr-Bremse AG, including Faiveley Transport S.A., and Westinghouse Air Brake Corporation.

63.     The DOJ's investigation of the Wabtec-Faiveley merger detected the no-poach agreements between the companies, which then resulted in the launch of a separate investigation, pursuant to which the DOJ found the companies' agreements unlawfully allocated employees between the companies and were *per se* illegal under the Sherman Act. The DOJ concluded that

16

Defendants' agreements "disrupted the normal bargaining and price-setting mechanisms that apply in the labor market." The DOJ also concluded that Defendants' agreements "were naked restraints on competition for employees and were not reasonably necessary to any separate legitimate business transaction or collaboration between the firms."

64.     On April 3, 2018, following its investigation, the DOJ filed a complaint in federal court against Defendants Knorr and Wabtec, and reached a settlement with the two companies. The DOJ announced that it had settled with Knorr and Wabtec after discovering that the companies "had for years maintained unlawful agreements not to compete with each other's employees." In connection with its announcement, AAG Delrahim stated that "[t]oday's complaint is part of a broader investigation by the Antitrust Division into naked agreements not to compete for employees—generally referred to as no-poach agreements."

65.     Under the terms of the settlement, Wabtec and Knorr are prohibited from entering, maintaining, or enforcing no-poach agreements with any other companies going forward. The proposed stipulation and order by the DOJ covers both parent companies Wabtec and Knorr, and their successors and assigns, subsidiaries (including Faiveley Transport), divisions, groups, affiliates, partnerships, joint ventures, directors, officers, managers, agents, and employees.

66.     The DOJ noted that it "pursued the agreements at issue in the Complaint by civil action rather than as a criminal prosecution because the United States uncovered and began investigating the agreements, and the Defendants terminated them before the United States had announced its intent to proceed criminally against such agreements."

67.     As part of the DOJ's filings, it emphasized that the settlement agreement with Defendants covered a restraint on soliciting, recruiting, hiring without approval, or otherwise

competing for various employees, including "project managers, engineers, executives, business unit heads, and corporate officers." This restraint deprived workers of "competitively important information that they could have leveraged to bargain for better job opportunities in terms of employment."

## VI.    HARM TO COMPETITION AND ANTITRUST INJURY

68.    Defendants' conspiracy suppressed Plaintiff's and the Class' compensation and restricted competition in the labor market in which Plaintiff and the other Class members sold their services. It did so through a scheme to limit solicitation of each other's employees and to limit compensation for their employees.

69.    Defendants' conduct intended to and did suppress compensation. Concerning the anti-solicitation scheme, cold calling and other forms of solicitation have a significant beneficial impact for individual employees' compensation. Cold calls from rival employers may include offers that exceed an employee's salary, allowing her to receive a higher salary by either changing employers or negotiating increased compensation from her current employer. Employees receiving cold calls may often inform other employees of the offer they received, spreading information about higher wage and salary levels that can similarly lead to movement or negotiation by those other employees with their current employer or others.

70.    Active solicitation similarly affects compensation practices by employers. A firm that solicits competitors' employees will learn whether their offered compensation is enough to attract their competitors' employees, and may increase the offer to make themselves more competitive. Similarly, companies losing or at risk of losing employees to cold-calling competitors may preemptively increase their employees' compensation in order to reduce their competitors' appeal.

18

71.     Information about higher salaries and benefits provided by recruiters for one firm to employees of another naturally would increase employee compensation. Restraining active recruitment made higher pay opportunities less transparent to workers and thus allowed employers to keep wages and salaries down.

72.     The compensation effects of cold calling are not limited to the particular individuals who receive cold calls, or to the particular individuals who would have received cold calls but for the anticompetitive conduct alleged herein. Instead, the effects of cold calling (and the effects of eliminating cold calling, pursuant to agreement) commonly impacted all workers and Class members employed by the Defendants.

73.     The Defendants themselves have issued statements connected to their involvement with the anti-solicitation scheme uncovered by the DOJ's investigation. A public statement issued by Knorr on April 3, 2018 indeed noted that "Knorr-Bremse has agreed to the settlement to put this matter behind it and to continue its focus on providing state-of-the-art systems, services, and integrated solutions to its customers." Similarly, Wabtec issued a statement on April 3, 2018, stating the company settled to avoid "the cost and distraction of litigation."

## VII.   FRAUDULENT CONCEALMENT

74.     Throughout most of the Class period, indeed not until the DOJ's settlement with Defendants became public on April 3, 2018, Plaintiff and Class members had neither actual nor constructive knowledge of the pertinent facts constituting their claims for relief asserted herein.

Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy.

**A. Defendants Took Affirmative Steps to Mislead Class Members and Conceal the Conspiracy.**

75.     Defendants took many steps to conceal the conspiracy from Class members. They guarded their conspiratorial communications to keep them from coming to light, and they affirmatively misled Plaintiff and the Class as to what they did to retain or find employees. They made these misstatements in a variety of forms, including direct communications with Class members, codes of business conduct issued to Class members, and even public filings with regulatory bodies such as the Securities and Exchange Commission (the "SEC").

76.     Furthermore, as part of Wabtec's 2017 Form 10-K, filed with the SEC, Wabtec listed Knorr as its "main competitor" while reporting to shareholders that management "recognizes its responsibility for conducting the Company's affairs according to the highest standards" including conducting "its business activities within the laws of host countries in which the Company operates."

77.     Similarly, Knorr's Code of Conduct applied to "all employees of the Knorr-Bremse Group worldwide" and expressly expected "the entire workforce not only to observe internal regulations but also to observe the law[.]"

78.     Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy among rail equipment companies to restrict competition for Class members' services through anti-solicitation agreements, and to fix the compensation of Class members. As discussed above, Defendants' discussions often occurred through direct conversations with each other's senior

executives or through email exchanges between senior executives and/or recruiters, information to which Class members were not privy.

79.     Defendants' conspiracy was concealed and carried out in a manner specifically designed to avoid detection. Through outside top executives and recruiting personnel, Defendants concealed and kept secret the illicit anti-solicitation agreements from Class members. Defendants relied on non-public methods of communication in order to prevent dissemination of the conspiracy beyond the individuals involved and to avoid unnecessarily creating evidence that might alert Plaintiff or other Class members to the conspiracy's existence.

80.     Defendants' conspiracy sought to reduce competition between firms in order to suppress compensation paid to employees in the market. Thus, fundamentally, Defendants' undisclosed, unlawful conspiracy restrained natural, competitive market forces. And the result of Defendants' concerted behavior was a market with diminished competition—and compensation levels—compared to a market free from Defendants' illegal restraint. Succinctly stated, compensation was not set competitively and was instead the result of anti-competitive and illegal conduct. Defendants represented the exact opposite to Class members.

81.     Upon information and belief, to cover up their conspiracy and prevent Plaintiff and Class members from learning that their compensation was suppressed through collusion, Defendants routinely provided pretextual, incomplete, or materially false and misleading explanations for compensation decisions and recruiting and retention practices affected by the conspiracy.

**B. Plaintiff and Class Members Lacked Actual or Constructive Knowledge of the Conspiracy During the Class Period.**

82.     Because of Defendants' successful deceptions and other concealment efforts described above, Class members had no reason to know Defendants had conspired to suppress

compensation throughout the class period, up until April 3, 2018, when the DOJ announced it had charged Defendants with *per se* violation of the Sherman Act in connection with their no-poaching agreements and settled with them.

83.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and the Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

## VIII.   INTERSTATE COMMERCE

84.     During the Class Period, Defendants employed Plaintiff and other Class members in at least Pennsylvania, Texas, New York, South Carolina, Maryland, and Delaware. Defendants' other subsidiaries employed workers in at least Ohio, Virginia, Kentucky, Illinois, California, and Wisconsin.

85.     States compete to attract rail-equipment industry offices, leading employment in the industry to cross state lines.

86.     Labor competition in the rail and freight industry is nationwide. Defendants considered each other's wages to be competitively relevant regardless of location, and many Class members moved between states to pursue opportunities.

87.     Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust industry throughout the United States.

## IX.   CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). The Class is defined as follows:

> All natural persons employed by Defendants or their wholly owned subsidiaries at any time from 2009 to the present. Excluded from the class are senior executives

and personnel in the human resources and recruiting departments of the Defendants, and employees hired outside of the United States to work outside of the United States.

The "United States" includes all fifty states, the District of Columbia, and all U.S. territories.

89.    The Class contains hundreds, if not thousands, of members, as each Defendant employed hundreds or thousands of Class members each year. The Class is so numerous that individual joinder of all members is impracticable.

90.    The Class is ascertainable either from Defendants' records or through self-identification in the claims process.

91.    Plaintiff's claims are typical of the claims of other Class members as they arise out of the same course of conduct and the same legal theories, and they challenge Defendants' conduct with respect to the Class as a whole.

92.    Plaintiff has retained able and experienced antitrust and Class action litigators as his counsel. Plaintiff has no conflicts with other Class members and will fairly and adequately protect the interests of the Class.

93.    The case raises common questions of law and fact that are capable of Class-wide resolution, including:

        a.   Whether Defendants agreed not to solicit each other's employees;

        b.   Whether Defendants exchanged competitively sensitive wage information and agreed upon compensation ranges for positions held by Class members;

        c.   Whether such agreements were *per se* violations of the Sherman Act;

        d.   Whether Defendants fraudulently concealed their conduct;

    e.   Whether and the extent to which Defendants' conduct suppressed compensation below competitive levels;

    f.   Whether Plaintiff and the other Class members suffered injury as a result of Defendants' agreements;

    g.   Whether any such injury constitutes antitrust injury;

    h.   The nature and scope of injunctive relief necessary to restore a competitive market; and

    i.   The measure of damages suffered by Plaintiff and the Class.

94.    These common questions predominate over any questions affecting only individual Class members.

95.    A class action is superior to any other form of resolving this litigation. Separate actions by individual Class members would be enormously inefficient and would create a risk of inconsistent or varying judgments, which could establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of Class members to pursue their claims. There will be no material difficulty in the management of this action as a class action.

96.    Injunctive relief is appropriate with respect to the Class as a whole because Defendants have acted on grounds generally applicable to the Class.

## X.   CLAIM FOR RELIEF—VIOLATION OF SECTIONS ONE AND THREE OF THE SHERMAN ACT

97.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

98.    Defendants, by and through their officers, directors, employees, or other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of 15 U.S.C. §§ 1, 3. Specifically, Defendants agreed to restrict

competition for Class members' services through refraining from solicitation of each other's employees, thereby fixing the compensation ranges of Class members, all with the purpose and effect of suppressing Class members' compensation and restraining competition in the market for class members' services.

99.     Defendants' conspiracy injured Plaintiff and other Class members by lowering their compensation and depriving them of free and fair competition in the market for their services.

100.    Defendants' conspiracy is a *per se* violation of Sections 1 and 3 of the Sherman Act.

## XI.     PRAYER FOR RELIEF

101.    WHEREFORE, Plaintiff Travis Carruth, individually and on behalf of a Class of all others similarly situated, requests that the Court enter an order or judgment against Defendants including the following:

a.  Certification of the Class described herein pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.  Appointment of Plaintiff Travis Carruth as Class Representative and his counsel as Class Counsel;

c.  Threefold the amount of damages to be proven at trial;

d.  Pre-judgment and post-judgment interest as provided for by law or allowed in equity;

e.  A permanent injunction prohibiting Defendants from hereafter agreeing not to solicit other companies' employees, to notify each other of offers extended to potential hires, or not to make counteroffers, or engaging in unlawful

communications regarding compensation and agreeing with other companies about compensation ranges or any other terms of employment;

    f.   The costs of bringing this suit, including reasonable attorneys' fees and expenses;

    g.   All other relief to which Plaintiff and the Class may be entitled at law or in equity.

## XIII.   JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

102.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.


Dated: April 11, 2018               Respectfully submitted,

                                    */s/ David B. Spear*
                                    David B. Spear
                                    PA ID. #62133
                                    **MINTO LAW GROUP, LLC**
                                    Two Gateway Center
                                    603 Stanwix Street
                                    Suite 2025
                                    Pittsburgh, PA 15222
                                    Tel: (412) 201-5525
                                    dspear@mintolaw.com

                                    Michael D. Hausfeld
                                    Brian A. Ratner
                                    Sathya S. Gosselin
                                    Melinda R. Coolidge
                                    **HAUSFELD LLP**
                                    1700 K Street, NW
                                    Suite 650
                                    Washington, DC 20006
                                    Tel: (202) 540-7200
                                    mhausfeld@hausfeld.com
                                    bratner@hausfeld.com
                                    sgosselin@hausfeld.com
                                    mcoolidge@hausfeld.com

26

Scott Martin
Irving Scher
Jeanette Bayoumi
**HAUSFELD LLP**
33 Whitehall Street
Floor 14
New York, NY 10004
Tel: (646) 357-1100
smartin@hausfeld.com
ischer@hausfeld.com
jbayoumi@hausfeld.com

Brent Landau
**HAUSFELD LLP**
325 Chestnut Street
Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
blandau@hausfeld.com

Joshua H. Grabar
**GRABAR LAW OFFICE**
1735 Market St. Ste. 3750
Philadelphia, PA 19103
Tel: (267) 507-6085
jgrabar@grabarlaw.com

Counsel for Plaintiff and the Class